**UNITED STATES of America, Plaintiff,**

v.

**Irving BROWN et al., Defendants.**

**No. CR 79–105.**

United States District Court,
D. Oregon.

Sept. 4, 1979.

OPINION and ORDER

JAMES M. BURNS, District Judge.

This is one of the largest criminal cases (20 defendants, 21 counts) to be brought in this district in recent years. Originally, 20 persons were named as defendants, all indicted on June 12, 1979, on a single conspir-

---

12. "Excerpt of Proceeding During Closing by Mr. Harrington" p. 2.

acy charge (Count I). Ten of these defendants were indicted on one or more of 20 substantive charges as well. There are over forty overt acts allegedly performed by one or more defendants in furtherance of the conspiracy. The substantive counts charge violations of federal drug laws (21 U.S.C. § 841) and the anti-racketeering statutes (18 U.S.C. § 952). All substantive charges are said to have arisen from the same series of acts or transactions generally encompassed in the conspiracy.

The conspiracy, all told, is said to have started in early 1976, and to have continued until the date of the indictment. Three defendants (Mosely, Manus and Harvey) have pleaded guilty to one or more of these charges, or to substituted charges filed by information. The government indicates it believes that pleas of guilty or other dispositions will reduce the number of defendants at trial to perhaps 10–15 in number.

This indictment appears to have grown out of investigations wholly or largely begun by local drug enforcement officers— members of the Portland Police Bureau and the Multnomah County Sheriff's Office. Several defendants are, in fact, serving sentences for state convictions for drug offenses which appear to be the same acts alleged as substantive counts or overt acts in the conspiracy charged in the federal indictment. It is anticipated that local law enforcement officers will play a key role in the prosecution's case. The prosecutors have said that searches and seizures have involved about 100 individual law enforcement agents. The government attorneys offered a rough estimate to the Court that the government will have about 100 witnesses at trial.

Without consulting official statistics, I think it can safely be said that the Portland area is what would be termed a medium-sized metropolitan area. Although I have taken no evidence on the point, I have heard it remarked that for a city of its size, Portland is "over-lawyered." Whatever the truth of that remark in general, the number of panel attorneys who, along with the Federal Public Defender, take appointments in indigent cases and who specialize in this area of the law, is in fact comprised of a fairly small number of lawyers, probably about 25 or 30. The Court strives for a panel of the highest caliber. Most panel members have a good many years of experience in the field. In addition, keeping the panel small insures a frequency of appointment so that the members and skills will be kept finely honed. All counsel in the present case have represented a number of criminal defendants in state and federal court in their respective years of practice.

Further, the attorneys representing defendants in this case have dealt extensively with persons from lower socio-economic strata. For example, four of the 17 counsel have been deputy district attorneys for Multnomah County.[1] Two of these worked for varying periods of time in that office's Drug Enforcement Unit. At least one attorney now a defense counsel was assigned to that unit in the district attorney's office at a time co-terminous with overt acts alleged in the indictment in this case.

Three other individuals who are now appointed counsel in this case have served varying tenures with the State Public Defender's Office. (That office contracts with Multnomah County to assure legal representation for indigents who are accused of state crimes.) These three, of course, performed a variety of services for a large number of clients throughout the years during and preceding the events described in the indictment, and, to some extent, thereafter.

Each defense lawyer in this case shares to some degree a common concern. This concern stems from the possibility that counsel may face a prosecution witness about whom the attorney has knowledge of impeaching material because of a prior relationship with the witness, either as a client or otherwise. Counsel thus have expressed a fear

1. One has sought leave to withdraw; permission has been granted; I am told another is about to seek similar leave.

that discovery of such a set of circumstances will produce ethical concerns causing them to seek leave to withdraw (perhaps at a late date) or be required to remain in the case and later face possible post-conviction challenges which claim that they were unable to render effective assistance by reason of such circumstances.

It is, of course, within the realm of possibility that any practicing attorney will be faced with the dilemma of cross-examining a witness about whom special knowledge has been acquired. However, because of the particular experience and expertise of this group of attorneys in criminal matters and in representation of low-income clientele in the milieu of a city the size of Portland, the mere possibility comes much closer here perhaps to a substantial likelihood of a conflict of interest for one or more of these counsel.

These areas of conflict or potential conflict fall roughly into three classes:

1) The first category involves those who have been prosecutors for the State of Oregon (in Multnomah County) against one or more of the defendants in this case, in which the substance of the state charge arose out of the same operative facts as one or more of the charges or overt acts alleged here. A subdivision of this class would consist of instances in which counsel here was in the Multnomah County District Attorney's Office during such state prosecution, but did not take any part in any such state prosecution. It is contended that either of these two may represent forbidden conflict of interest by reason of Ethics Opinions of the Oregon State Bar (Opinions Nos. 169 and 207, copies attached as Appendix A). Essentially it is suggested that ethical considerations forbid a lawyer from representing a criminal defendant against a governmental entity (federal), when for-merly he or she prosecuted that person (or was a member of a prosecutor's staff which prosecuted that person) on behalf of another governmental entity (state) as to the same criminal episode.

2) The second claimed ethical problem arises from an instance in which counsel here has at any earlier time represented a person or persons who may be witnesses for the government in this case or who are unindicted coconspirators,[2] or both. During the course of the former representation the lawyer may have come into possession of wide knowledge concerning the client's previous activity. Such activity might furnish grounds here for impeaching questions to be asked. It is suggested that the circumstances place lawyers in a dilemma. As lawyer there, he or she acquired through privileged communications knowledge of actions which here furnish potential for impeachment of the witness. As lawyer here, he or she would be unable to use that knowledge and thus would not be able effectively to represent his client here.

3) The third situation arises from a different set of circumstances. It would be applicable to only former state prosecutors. Former prosecutors frequently or occasionally have been involved in actual or potential prosecutions involving confidential informants. The prosecutor, in order to gain valuable information, would extend the cloak of the informer's privilege. Under this cloak, substantial knowledge might be (and normally is) gained of past unsavory activities of the informant furnishing a rich vein to be mined for potential impeachment material. However, the argument runs, the informer's privilege belongs to the State of Oregon (ORS 135.855(1)(b)). In effect, this means the state prosecutor's office. As its possessor, the prosecutor is the only one

---

2. I find it difficult to understand the merit in the claim as to unindicted co-conspirators who are not expected to be called as government witnesses. I note that the indictment charges the defendants with conspiring with others—which indicted co-conspirators include those who are both "known" as well as "unknown" to the grand jury. If persons exist whom the government believes are co-conspirators, who are unindicted but who will not be called as government witnesses, I decline to speculate as to what purpose may be served by such an allegation. Further, defendants have not raised any question as to whether their claimed conflict problems might prove troublesome if unindicted co-conspirators were called as defense witnesses, in light of Rule 607, Fed.R. Evid.

who could waive. Absent such a waiver, the argument runs, the lawyer would be in a comparable dilemma. He or she possesses knowledge of impeaching material as to that confidential informant, now appearing as a witness. He or she would be unable to use it because he or she is no longer in a position to be legally entitled to waive on behalf of the State of Oregon that privilege.

Note that the two ethics opinions prohibiting the former District Attorney from representing "the other side of the fence" arise in situations where representing the second client involves taking a position adverse to the interests of the public employer. (169 and 207) This may be distinguished from situations in which a former public official may not gain financial reward from information obtained in public office (former District Attorney who successfully prosecutes X for assault and battery cannot represent X's victim in a civil suit against X for damages arising from the same incident.

However, in the present case, defending a person indicted on federal (U.S. Government) charges does not put the lawyer in an adverse position to the State of Oregon even if the same acts are involved. Thus, this does not seem to be the situation of Opinion 169, where the former District Attorney would have worked "both sides of the street," i. e., on the appeal of the same defendant on the very same state charges. Nothing that transpires in the present case ought to affect the state's interests. The state's interest in the conviction of a person already tried (and convicted) in state court would in no way be disturbed if that same person were tried here (on federal charges arising from the same acts) and were represented here by a lawyer who was formerly a state prosecutor. If the present defendant has qualms about his counsel, but agrees, after full disclosure, to proceed, I

doubt seriously that these opinions would forbid such representation.

Opinion 54, for example, says:

"It is not unusual for a lawyer to find himself on the opposite side of a matter involving a former client. As long as it is unrelated, or his former employment and information thereby gained does not now place him in a favored position, and if, after a full disclosure of the facts, the prospective client is satisfied and desires the lawyer to represent him, it is proper for the lawyer to do so."

This again examines the problem from the perspective of whether the employment gives the attorney some present advantage over the former client.

Even putting aside the fact that the advantage, if any, is the knowledge of impeaching evidence which might weaken the federal government's case (not a prosecution by the state), the attorney cannot use the information which is privileged, so there is no advantage which can be used. Nor is the present client disadvantaged if the information is such that no other attorney could discover or reveal the damaging facts. Even so, full disclosure which involves explaining to the client that if a certain witness appears about whom the lawyer has information but cannot use it would seem to meet the requirement of Opinion 54. The evil being protected against is misuse of confidential information against a former client. The potential harm accruing to the later client because of his attorney's enforced silence is a matter to be disclosed and discussed with the client. The absolute prohibition against working both sides of the same case is designed to protect the former client, not the latter. So long as the attorney does not conduct himself in a manner adverse to the former client and the later client knows of the prior relationship, it seems questionable whether the attorney is required to withdraw for that reason alone.[3]

---

**3.** I recognize that ethics matters are largely for the individual lawyer, the bar association and the Oregon Supreme Court. It is unnecessary for me here to express any opinion as to the ethics, per se, of any given situation. In a

specific case (as has already happened in this case with two lawyers) if the lawyer believes a conflict exists which requires withdrawal, that lawyer need only come to see me. If I agree that the matter is troublesome or colorably

Nonetheless, the facts suggest some likelihood of ethical problems for a number of the counsel in this case. If such problems do occur, it is likely they would be seen to be of such magnitude as to force a withdrawal request by the affected counsel. Thus the specter is presented of substitution of defense counsel between now and trial, perhaps upon the eve of trial. Such last minute substitutions may have serious repercussions on the efficient administration of justice in order to avoid impairment of a particular defendant's right to effective assistance of counsel in the instant case.

I have purposely approached the matter in this manner so as to distinguish it from the ordinary situation in which a defense attorney seeks discovery of names of witnesses. The essential purpose of pretrial discovery of witnesses, whether the motion is made under statute, rule, or theory of fundamental fairness, is to prevent surprise at trial. The defense attorney, though hindered by such surprise, may proceed adequately to represent his client. In the matter at hand, I do not yet consider this element of surprise.

In most criminal cases, the likelihood of such last minute substitution is minimized. The defendant will have a general idea of what persons are of his acquaintance and who thus may be involved as witnesses. Conference with the lawyer will turn up any conflict matters. Here, the sheer number of defendants, the nature of the charge of a long-term on-going conspiracy involving co-conspirators, the identity between state and federal charges, and the other factors mentioned, increase the likelihood of attorney conflict of interest. With these particular facts and circumstances in mind, I turn now to the case law for the most appropriate solution for all involved.

The defendant in a criminal case is not entitled as a matter of right to the name of any witness, *U. S. v. Payseur*, 501 F.2d 966, at 972 (9th Cir. 1974).[4] None of these defendants has yet shown any "ordinary" right to discover the names of government witnesses in advance of trial, as discovery is intended within the meaning of the Fed.R.Crim.P., especially Rule 16.

However, this Court does have broad discretion as to whether to compel pretrial disclosure of witnesses in the interests of justice, *U. S. v. Clardy*, 540 F.2d 436, at 442 (9th Cir. 1976). Nonetheless, as a general rule, such disclosures are rarely ordered. *U. S. v. Clardy, supra* ; *U. S. v. Richter*, 488 F.2d 170 (9th Cir. 1973). Despite the rarity with which the facts warrant the exercise of this discretion, this Court has "the responsibility to supervise the administration of criminal justice in order to ensure fundamental fairness," *U. S. v. Richter, supra*, at 173. Thus, discretion to order witness list disclosure at any early time is established.

Based upon the above facts and this unique situation, I conclude that the possibility of precipitous withdrawal of counsel late in the proceedings—or even during trial—because of ethical conflicts is serious and is a real threat in this case. I therefore order the government to disclose to all counsel the names of all[5] government witnesses who are not police officers by September 7, 1979. Defense counsel who receive this list of names pursuant to this order are ordered not to divulge the same to their clients at this time. It is to be used solely for the purpose of checking client records and determining whether any potential conflict of interest may be foreseen at this time. Each attorney who receives this information is to use it accordingly.

close to any ethics line, I would, of course, allow withdrawal, and commence anew the increasingly difficult search for substitute counsel.

**4.** Except as provided in 18 U.S.C. § 3432 in capital cases, or in the presence of a constitutional imperative. Section 3432 is not applicable since no capital offenses are charged.

**5.** I recognize in a case of this kind that the government may not know at this time of all witnesses it will call. I ask government counsel to err on the side of "over-naming" rather than "under-naming." If problems occur, I will schedule an early conference.

I do not herein rule in any way upon any other motions for discovery of the names of witnesses for use in preparation for trial. I reiterate that I am presently and herein confining my order to the facts as described within this order. Should the government feel it can make a bona fide showing (if necessary on an *in camera* basis) that disclosure as to a particular witness at this time and under these limits should not occur for special reasons, I invite the prosecutors so to apply.

Based upon the foregoing,

It is so ORDERED.